IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 21-cr-104-RM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ZACHARY PAUL ANDERSON,

    Defendant.
_____

**REPORTER'S TRANSCRIPT**
SENTENCING HEARING
_____

    Proceedings before the HONORABLE RAYMOND MOORE, Judge,

United States District Court for the District of Colorado,

occurring at 9:30 a.m., on the 29th day of August, 2022, in

Courtroom A601, United States Courthouse, Denver, Colorado.

**APPEARANCES**

    Daniel McIntyre, Assistant U.S. Attorney, 1225 17th

Street, Suite 700, Denver, Colorado, 80202, appearing for the

Government.

    John Richilano, Attorney at Law, Richilano Shea

L.L.C., 1800 15th Street, Suite 101, Denver, Colorado, 80202,

appearing for the Defendant.

TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1                      **P R O C E E D I N G S**

2          (In open court at 9:34 a.m.)

3              *THE COURT:*  Please be seated.  21-cr-104, United

4    States versus Zachary Paul Anderson.  We're here today for, I

5    suppose, hearing on the the Motion to Withdraw the Plea of

6    Guilty, as well as Sentencing; if I deny the motion.

7              Let me take appearances, starting with the government.

8              *MR. McINTYRE:*  Good morning, Your Honor.

9    Daniel McIntyre, on behalf of the United States.

10             *THE COURT:*  Good morning, to you.

11             *MR. RICHILANO:*  Good morning, Your Honor.

12   John Richilano, appearing with Mr. Anderson.  He is present, in

13   the courtroom.

14             *THE COURT:*  Good morning to you, good morning to

15   Mr. Anderson, as well.

16             All right.  So, I think, obviously, I begin with the

17   Motion To Withdraw, and I think that the record is fairly clear

18   as to the triggering event for the Motion To Withdraw, and

19   sometimes it's just, kind of, good luck or bad luck of the

20   draw.

21             After the plea and after the Presentence Report was

22   completed, I was working on another case, unrelated to this

23   one, and the defendant there had an issue with respect to crime

24   of violence, and I was knee deep in crime of violence and what

25   that means under the guidelines.  I put that down, I picked up

1    this case, and it became reasonably apparent to me that

2    Mr. Anderson was a career offender, under the guideline, upon a

3    review of the Presentence Report.

4           My response to that, and I should note, differed from

5    what would have happened if original counsel were here.  If

6    original counsel were here, I would simply show up and raise

7    this at sentencing and work it all out then, but I'm also aware

8    of the fact that Mr. Richilano came into the case after the

9    Change of Plea, and is here... late is not the right word, but

10   late in the process, and so wasn't involved in the original

11   calculations, and I thought, you know, the best thing do is to

12   just kind of put this out in front of everyone.

13          I called the probation department.  I did not tell

14   them what to do.  I did not suggest to them to change their

15   calculation, but I explained to them what I thought, which was

16   that he had two prior crimes of violence and what my rationale

17   was and asked them to take a look at it.

18          Immediately, thereafter, I sent an email to counsel,

19   Mr. Richilano was included in his pleadings, which essentially

20   said, look, I think that he is a career offender, I don't know

21   what probation is going to say, but here is exactly why I think

22   that, and you can get a head start on it.

23          Well, probation looked at it and concluded that he was

24   a career offender for the, essentially, the same reason that I

25   did, and over the course of the various subsequent filings,

1    included the sentencing documents from -- that were pertinent

2    to this case; that was met with a Motion To Withdraw The Guilty

3    Plea, and there really are two prongs or horses that are being

4    ridden; one is, the argument was that the plea was involuntary;

5    and the second argument came later; it came in a reply to the

6    Motion To Withdraw; but it is that, *Well, he is legally*

7    *innocent*; there being no claim of innocence made at the time of

8    the first motion.  All right.  That's, essentially, the

9    background; it is what it is.

10          What I have done is I have looked at the original

11    motion, and I have looked at what I consider to be the

12    supplement to the motion, because Mr. Richilano filed a motion

13    to continue the sentencing date, which included some additional

14    information that was pertinent to the discussion about whether

15    or not I would allow Mr. Anderson to withdraw the guilty plea.

16          I'm going to deny the Motion To Withdraw The Guilty

17    Plea and conclude that there's no fair or just reason for

18    permitting the plea to be withdrawn.  I'm going to make the

19    record that, I think, needs to be made, and then I will give

20    you an opportunity to argue, Mr. Richilano; and in the event

21    that you say something that I have not considered, I suppose

22    it's possible that I could be talked out of it; I just don't

23    anticipate it.

24          The first thing that I would say is that the motion --

25    well, the request, itself, puts the Court in an odd position,

1    not initially, when the core of it was supposed involuntariness

2    of the plea, but once it got to the issue of legal innocence,

3    the fact that the motion was framed in the alternative put me

4    in an awkward circumstance, because if, in fact, he is

5    innocent, the situation was that I was being asked to let him

6    withdraw the plea, if I was going to apply the career offender

7    guideline.

8         Well, if he is innocent, I can sentence him under the

9    regular guidelines and that's no problem, but if I give him

10   career offender guideline then it's a problem?  That was

11   uncomfortable.  But the real reason that I conclude that there

12   is no fair or just reason is that, as I work through this, it

13   becomes apparent that the involuntariness piece is simply not

14   there and the innocence piece is not either.

15        I begin with the notion that there's been no quarrel

16   with -- about the voluntariness or the plea or innocence or

17   anything else for about nine months; that's between the time of

18   the Change of Plea and the time that the motion was first

19   filed.  Particularly, if there is an assertion of innocence, it

20   is odd that nine months transpires before that assertion is

21   made, and then it's only made when there is a guideline error

22   that's brought to the attention of the parties by the Court.

23        Putting that to the side, I turn to the Plea

24   Agreement, and I look at page five, and there on page five I

25   simply note that there's discussion of certain matters that

1   were known to Mr. Anderson, even before he walked into the

2   courtroom, because these are things that are part of the Plea

3   Agreement, that are reviewed before the Change of Plea hearing.

4   Among other things, the Court -- the document states on the

5   page reference that there are seven factors to be considered at

6   the time of sentencing, but then it goes on to say that, *The*

7   *Court is free, upon consideration of these factors, to impose*

8   *that sentence which it, quote, deems appropriate, in the*

9   *exercise of its discretion, and that such sentence may be less*

10  *than that called for by the advisory guidelines, in length or*

11  *form, within the advisory guideline range or above the*

12  *guideline range, up to and including imprisonment for the*

13  *statutory maximum*, and as the document had previously noted,

14  the statutory maximum in this case was and is ... not less --

15  excuse me -- not more than, um ... 20-years imprisonment.

16          Not only does that document suggest that this notion

17  of involuntariness is not grounded in fact, I also looked at

18  the Statement By Defendant In Advance Of Plea Of Guilty, with

19  regard to the statement by defendant, on page three, the

20  following occurs, or is stated, quote, *It is possible that the*

21  *Court could, after considering these factors, impose any*

22  *sentence in my case, including one which is -- which is as*

23  *severe as the maximum term of imprisonment, the maximum fine,*

24  *full restitution, if applicable, the maximum term of supervised*

25  *release and a special assessment, all as set forth in paragraph*

1    *three below*; and in paragraph three below it does refer to the

2    maximum, again, as being 20-years imprisonment.

3            Well, that's all of the paperwork, but at the time of

4    the Change of Plea, I did, in this case, what I always do,

5    which is to say that the guideline calculations are just

6    estimates; they are not binding on me; I tell the parties that

7    they are not even binding on them, because it is entirely

8    possible that I may see something or probation may see

9    something that the parties have not and that may cause one or

10   more or all of the impacted players to change their position.

11           Even -- and so, you have got all of these things that

12   are going on, and to me the notion that there's an

13   involuntariness, because the guideline changed and that somehow

14   it wasn't deemed or considered as an available penalty is just

15   simply not consistent with the facts of this case.  There are

16   some additional matters, and that is that I turn to, and that

17   is the ... some earlier statements that were made, that are

18   pertinent to the issue of innocence, and that is that in -- in

19   the variance request, which is **ECF Number 32**, at page eight,

20   there's a description of the event, of the assault, in this

21   case, and that assault was described as one where Mr. Anderson,

22   quote, *voluntarily chose to headbutt the prison officer* and of

23   course that's consistent with the Plea Agreement, which set

24   forth the elements of the offense as including, quote, *the*

25   *defendant did such acts intentionally*, and so now, with that as

1    the backdrop, we turn to the the issue of whether or not there

2    is a basis -- a substantial basis, a credible claim of either

3    legal or factual innocence?

4            There's no claim of factual innocence here.  There's a

5    claim of legal innocence.  And as I understand it, it is ...

6    based on the notion of coercion or duress.  I don't think it

7    rises to the level of a credible claim for a number of reasons.

8    Number one, if you look at the instruction, the Tenth Circuit

9    instruction, Instruction 1.36, for coercion and duress it

10   describes a circumstance where the defendant was under an

11   imminent and impending threat of such a nature as to induce a

12   well-grounded apprehension of death or serious bodily injury.

13   It also requires that the defendant had no reasonable, legal

14   alternative to violating the law, in that he had no chance to

15   both refuse to do the criminal act and avoid the threatened

16   harm.

17          The argument here is that the guard called

18   Mr. Anderson a bitch, and there's some discussion as to whether

19   the word bitch means the same thing as snitch.  I don't really

20   think it does.  I don't, in saying that, mean to suggest that

21   it's not a loaded term, internally.  I think, within the walls

22   of an institution, if you call someone a bitch, it basically

23   means that they are weak.  They are not going to stand up for

24   themselves.  You can run right over them.  They are ... well,

25   let's just say there are other similar vulgar terms that are

1   synonyms for that, and it may spark some kind of a response

2   from the individual who is called that label, but that is

3   really not the question.

4          The question is whether or not the conditions for

5   coercion or duress exist and they don't.  I'm not even sure how

6   the timing plays out here, because I'm told that, in some way,

7   the guard calls Mr. Anderson a bitch and is in connection with

8   laundry, and they are doing laundry and other people can hear.

9   I don't know when this occurred in terms of its temporal

10  proximity to the assault, because at the time of the assault,

11  there's no laundry matters that are going on.  He is being

12  brought from a cell in the SHU to medical, I believe it was,

13  and is cuffed up and removed from the cell.  So there is some

14  period of time, and it may well be a considerable period of

15  time, since people in the SHU are not, generally, together as

16  inmate clusters, to where some comment made is heard by, quote,

17  the group, and could have some kind of a response or trigger

18  reaction of fear, because they are going to hear it, and they

19  are going to, basically, treat me as a, quote/unquote, bitch.

20         But I don't have any information that would even

21  permit me to create temporal proximity.  As I indicated, there

22  are other things that are going on by way of prior statements.

23  The prior statements included in the original Motion For

24  Variance, is this is a voluntary act.  None of this is a

25  surprise, because all of this, *he called me a bitch*, was

1  included in the original Change of Plea documents, so at the

2  time that the defendant pled guilty, these things were known,

3  described, discussed and were not deemed, were not deemed to be

4  in any way, shape or form any form of defense.  They simply

5  became such when the desire to withdraw to the plea occurred.

6      And then, again, at the end of the day, the real

7  problem, in this case, and in all cases of coercion or duress,

8  is the impending threat.  There has to be a real true -- not

9  possibility, down the road, somebody is going to do something

10  to me.  There has to be an impending threat, to where you

11  cannot stay safe, except through doing the criminal act, and

12  here, as far as I know, I know he is in the SHU, he is in the

13  SHU, in a cell, I believe by himself.  There's no threat

14  impending, or certainly not immediate, certainly not impending.

15  I don't think it simply meets the definition in any way, shape

16  or form.

17      The next piece is that I have looked at the factors,

18  although I have only spoken to two of them, there are seven

19  factors that one looks at in deciding whether or not to allow

20  someone to withdraw the plea.  The assertion of innocence, I

21  have already covered.  It does not support withdrawing the plea

22  of guilty.

23      Prejudice to the government; it's minimal, and I

24  wouldn't deny a motion on that basis.  Is there a delay?  Third

25  factor.  Yeah, because, ultimately, the career offender status

1    or non-status, has nothing to do with the assertion of

2    innocence.  If you are innocent, there should be some timely

3    assertion, but there's not.  As I said, it's months and months,

4    and months and months, and only after I bring a guideline issue

5    to the parties' attention that all of a sudden this gets

6    raised.

7            Is there inconvenience to the Court?  Yes.  But again,

8    I don't really decide motions on that basis.

9            Did Mr. Anderson have the assistance of counsel?  He

10   had the assistance of two counsel.  He had the assistance of

11   Ms. Butterton pre-plea, and he had the assistance of

12   Mr. Richilano post-plea.

13           One of the things that I will pause on, is that I --

14   in my email to counsel, I said, *the parties overlooked this*.  I

15   need to step back from that, to the extent that it speaks to

16   defense counsel; the reason is, I don't know what defense

17   counsel knew.

18           What I know is that if I were defense counsel, and the

19   government brought me a Plea Agreement that said that my guy

20   was not a career offender, and I thought he was, I don't think

21   I would have gone to the government and said, *Oh, no, no, no,*

22   *change this, and give me five times the exposure.*  I would

23   probably go to my guy and say, *Look, this is messy, they are*

24   *screwing this up, let's see if it gets by?*  I don't honestly

25   suggest that I know that such a conversation did or did not

1    happen with Ms. Butterton, nor do I know that such conversation

2    did or did not happen with Mr. Richilano, and I am not

3    suggesting anything as to either counsel.  But there was the

4    assistance of counsel, is what I'm saying.  I don't know what

5    the state of discovery was.  I do know that there was not a

6    criminal history provided as part of the pretrial services

7    report, because Mr. Anderson came here on a writ, and thus

8    there was no pretrial services report prepared.

9         Anyway, moving on.  Voluntary -- knowing and

10   voluntary -- was the plea knowing and voluntary?  It was, and I

11   so find it was; and would it waste resources?  Yes, it would.

12   But again, I don't consider that to be the important factor.

13   To me, you can withdraw the plea, when there is traction, if

14   you would, to either knowing and voluntariness of the plea or

15   the assertion of innocence, and there being at least a credible

16   claim for legal defense or factual innocence, and simply, I

17   find it to be not the case that either of those things are in

18   play.

19        The fifth and final thing that I will say, with regard

20   to this, is that in the Motion To Continue, which is **ECF Number

21   42**, the defendant added some additional information as to the

22   mental-health background of Mr. Anderson.  I accept all of

23   that.  I note that much of that was known to me at the time of

24   the original Presentence Report, and the original Motion For

25   Variance.  I also note that mental-health issues were included

1    in the Presentence Report that was done in the Utah District

2    Court, and certainly there were references to pretrial

3    matters -- to mental-health matters in the draft presentence

4    report in this case.  But beyond that, there was a request to

5    obtain additional discovery, that is simply not going to be

6    allowed.  It's not necessary, and it is, from where I sit,

7    essentially, some kind of a fishing expedition to see if there

8    can be something that would bolster either the claim

9    involuntariness or more likely the claim of coercion or duress.

10           The most -- then beyond that, there were requests to

11   continue this, so that the convictions -- the predicate

12   convictions could be attacked.  I should note that there's

13   actually three of them.  There's two assault -- there's two

14   felony assaults, one of them I just ignored, because it seemed

15   to me that the most easy and obvious analysis for a career

16   offender was to look at the aggravated assault and the

17   enumerated offense of possession of a sawed-off shotgun.  But

18   I'm not unmindful of the fact that there's a third qualifier

19   there, there's a third felony assault, that occurred in the

20   district of Utah, but in any event, the notion is that more

21   time, a continuance is needed, so that attacks can be launched

22   on those convictions, obviously, if those convictions

23   disappeared, the necessary ingredients, if you would, for

24   career offender would also disappear; but that's just not the

25   way sentencing works.  If you can have some relief, with regard

1    to those, then perhaps you can come back here and get some

2    relief from me, but I would also say, that I doubt, seriously,

3    that there's any basis.

4            For example, in terms of the Utah conviction, I can't

5    speak for the Utah Judge, but if I were the Utah Judge I know

6    what I would say with regard to any 2255; and that is this,

7    2255 is time barred unless it's filed within one year of the

8    case becoming final.  This is way past that.  Way past that.

9    And so even if there's some -- and it is all unstated -- basis

10   for challenging that conviction, the likelihood is that any

11   such attempt to file a 2255 would be met with claims of

12   procedural default, time barred and a variety of other defenses

13   that are probably also available in the state court, but I'm

14   not trying, again, to rule on those types of things.  I'm

15   simply saying, federal sentences don't get delayed, so that, I

16   don't, know months or years of attacks on underlying

17   convictions, in the criminal history section of the Presentence

18   Report can be attempted, so that the ultimate guideline range

19   becomes something other than what it is.

20           So, that's my entire analysis.  Comment or position or

21   addition or anything from the government?

22           *MR. McINTYRE:*  The government agrees with the Court's

23   analysis.

24           *THE COURT:*  Mr. Richilano, I understand where you are

25   coming from, but I will give you the opportunity to make

1    whatever record you want to make.

2         MR. RICHILANO:  The Court puts me in a difficult

3    position.

4         THE COURT:  I know.  I mean, it's even worse than

5    that, because, of course, all of this talk about innocence,

6    innocence, innocence, is kind of pulling away from acceptance

7    of responsibility, but I'm going to tell you, I understand the

8    position you are in.  I'm not doing that to Mr. Anderson.

9         MR. RICHILANO:  He is not aware of the notion here of

10   legal innocence because of his psychological construct.  If you

11   look at page nine of our supplement, **Document 42**,

12   Dr. Freedman, who provided much of that information, pulls

13   together how Mr. Anderson's history as a sex-abuse survivor

14   relates to how immediate the threat of being called a bitch in

15   the SHU was.  He saw that as an immediate, sexualized threat;

16   maybe not even consciously; psychologically, he did.

17        THE COURT:  Well, when did it happen?  I don't know.

18        MR. RICHILANO:  It doesn't matter to this extent,

19   because if I call you that name or you call me that name --

20        THE COURT:  We both have been called worse, but it's a

21   different context.

22        MR. RICHILANO:  We go on our way.  And even if one of

23   us is in prison and we're called that, it's -- it's *okay, fine.*

24   *F you*, and then it's over.  Not for somebody like Mr. Anderson,

25   who seething within him, for the last 20 years, is this trauma,

1    and when that trauma gets reawakened, it manifests itself in

2    destructive and ways that you and I would not understand or

3    relate to.

4           So, what that does is it compresses the time.  The

5    Court asked when did it happen.  I don't know either.  It might

6    have been 20 minutes.  It might have been a half hour.  It

7    might have been more.

8           THE COURT:  It might have been days.

9           MR. RICHILANO:  It wasn't days, it was the same day.

10          THE COURT:  I don't know that, but I will take your

11   word for it.  Some time that day.

12          MR. RICHILANO:  I will make a -- an offer to the Court

13   that when the headbutt happened, he was -- he had --

14   Mr. Anderson had been requesting to go see the bureau

15   psychologist to get back on meds, because he had been off meds

16   for the whole time he was in the SHU, ever since Utah.  Wanted

17   to get back on meds.  The interchange took place before that,

18   we know that, on the same day, you know.  My understanding is

19   that the officer came by three or four times, and each time

20   Mr. Anderson said, *Hey, I forgot to get my laundry out, can you*

21   *take it*?  No response.  Finally, the fourth time Anderson says,

22   you know, *F you*, *I'm not dealing with this.  I'm going to bed*.

23   That's when Officer Medina says, *That's right, you bitch, go to*

24   *bed*, loud.

25          He finally gets his request to go see Dr. Todd, that's

1    when the headbutt happens, that was his opportunity to, you

2    know, try to right this thing of, I got to show the people on

3    the yard and in the tier that I'm no bitch.  That -- his

4    history compresses whatever time that is to immediacy; that's

5    our position.

6              THE COURT:  I understand.

7              MR. RICHILANO:  Secondly, Your Honor, you know there

8    are very few reported cases where motions to withdraw guilty

9    pleas are granted and approved, because the ones that are

10   denied are the ones that are appealed.

11             THE COURT:  Right.

12             MR. RICHILANO:  However, United States against

13   *Sandoval* tells the Court that these motions should be viewed

14   with favor, and that a defendant seeking to withdraw his plea

15   should be given wide latitude.  There is so much going on here,

16   for this defendant, that the Court really cannot just look at a

17   mechanistic application of the Court's very, very thorough Rule

18   11 advisement, and a parsing of the words in the Plea Agreement

19   and the Statement In Advance Of Plea, when there is so much

20   going on in this man's head that, once again, it resurrects the

21   motion that, with ** Dr. Freedman's help, it became pretty

22   clear to me, sort of, at the time that we filed this that, wait

23   a minute, there is a legal defense here, because this isn't

24   just anybody being called a bitch.

25             So, Your Honor, those are my comments.  We, obviously,

1   don't agree with the Court's ruling.

2           *THE COURT:*  All right.  And I will just leave it at

3   that -- I will leave it at this, the individual events that may

4   go on in an individual's head does not change the fact that the

5   law requires imminent and impending threat.  The law requires

6   no reasonable legal alternative, and there's no credible

7   position that has been presented to me that these circumstances

8   exist.

9           All right.  Now, let's move forward from that and deal

10  with the objections, because separate and apart from the Motion

11  To Withdraw The Guilty Plea, there is -- there has been

12  objections to the treatment of Mr. Anderson as a career

13  offender.

14          Again, I have looked at all of this as carefully as I

15  did the Presentence Report in the first instance, and I'm going

16  to overrule the objections.

17          The first thing that I'm asked to do is to apply a

18  common-sense and nuanced approach and look at the facts of the

19  conviction; meaning, the facts of the possession of the

20  sawed-off that occurred in the U.S. District Court -- the

21  conviction occurred in the U.S. District Court to the District

22  of Utah.  The problem with that request is that that is

23  directly contrary to what the law says I do.  I look at the

24  conviction, and it either qualifies or does not qualify as

25  career offender.

1          I don't look at the facts -- the categorical approach

2     prohibits me from digging into the facts and seeing whether or

3     not, factually, it was or was not.  It is a very mechanical

4     rule that says you look at the conviction, if the conviction is

5     of this type, then it counts as a career offender; if it's of

6     that type, then it does not.

7          Mr. Richilano has also brought to my attention that

8     there are various cases in which the Courts have -- different

9     Courts have decided that possession of a sawed-off or

10    possession of an illegal weapon is not a crime of violence,

11    under the ACCA or under section -- under Title 18, United

12    States Code Section 16, that's all true.  I don't really have

13    any quarrel with any of that.  It doesn't have anything to do

14    with anything though, because career offender -- well, crime of

15    violence, for purposes of the guideline, frequently, frequently

16    mirrors the language in Section 16 of Title 18, but not always,

17    and this is one of those *not always*.

18          In fact, if you look at the motion, the motion refers

19    to this as applying to the conviction, because the conviction

20    falls under the residual clause of 4A1.6.... 2 -- excuse me--

21    4B1.2; but it doesn't, because we're not talking about the

22    residual clause.  It is an enumerated offense.  Something is a

23    crime of violence, if it is under 4B1.2(a)(2), murder,

24    voluntary manslaughter, and there's a further list, or, quote,

25    *The use or unlawful possession of a firearm, described in 26*

1    *U.S.C. Section 5845(a)*, unquote.  That's it.  There is no

2    residual clause going on here.  There is no issue of whether or

3    not it, factually, constitutes X, Y or Z.  Any conviction under

4    that statute is a crime of violence, and that's exactly what he

5    has got a conviction under that statute; that's why it's a

6    crime of violence.

7            So, to the extent that there's an objection and an

8    assertion that he does not have the requisite crimes of

9    violence, I note there's been no challenge to the offense of

10   conviction.  There's been no challenge to the aggravated

11   assault conviction, and the challenge has been whether or not

12   the Utah conviction for possession of a sawed-off constitutes a

13   crime of violence; that objection is made in the face of the

14   fact that the guideline says any conviction -- or says on

15   the -- the unlawful possession of a firearm, as described in

16   this statute, is a crime of violence, by definition, that is

17   exactly what we're looking at here.  We've got a conviction for

18   unlawful possession of a sawed-off.

19           So, the objection is overruled.  Anything for the

20   government?

21           *MR. McINTYRE:*  Nothing additional, Your Honor.

22           *MR. RICHILANO:*  No, Your Honor.

23           *THE COURT:*  All right.  Beyond that, there were other

24   objections to the Presentence Report that I also need to deal

25   with.  Those are, for the most part, moot.  Many of them were

1    dealing with the fact that there was a mistake made, with

2    regard to Mr. Anderson's age, and it was throughout the

3    presentence report, tossing or throwing off his age; the timing

4    when certain events occurred; there were misidentifications of

5    particular felonies -- excuse me -- of particular misdemeanors

6    as felonies and a miscounting of the number of felonies that

7    Mr. Anderson has; seven, not ten.  All of that was corrected

8    from the draft to the final investigation and so I deemed those

9    matters to be moot.  Do you disagree with me?

10          *MR. RICHILANO:*  No, Your Honor.

11          *THE COURT:*  All right.  Finally, there were some

12   additional matters that I will touch on.  They are these,

13   there's an objection with respect to paragraph 8, of the draft

14   report -- no let me take that back.  It's paragraph four.

15   Where gang affiliation is reported.  Supposedly he is -- has a

16   reported gang affiliation of *Peckerwood*, which he denies.  He

17   identifies with a different group, and that has been corrected

18   by inclusion of his statement in the final report.

19          I do agree with him that that term is a derogatory

20   term, but I -- the term *peckerwood* -- but I also know, for a

21   fact, that there is a gang that uses that name.  So it is what

22   it is.  I'm not basing anything that I do here, on whether

23   Mr. Anderson identifies with one gang or another gang or any

24   gang, because I don't think that that is where the heart of

25   this case lies.

1          So, I deem that as, to a degree, corrected by the

2     additional information provided in the report, and to the

3     extent not otherwise adequately addressed, I note that I will

4     not rely on it in any way, shape or form, in deciding the

5     appropriate sentence.

6          Any further record with regard to that?

7          MR. RICHILANO:  No, Your Honor.

8          THE COURT:  There is a matter that is a recurring

9     matter; and that is, there's a statement by Mr. Anderson about

10    being called a bitch, and being -- you know, why he acted as he

11    did.  We talked about that, somewhat.  There's also an

12    allegation that he was beaten while in four-point restraints,

13    off camera.  I note that the Presentence Report contains these

14    additional positions of Mr. Anderson, and I accept the fact

15    that that's his position.  I don't know that there's anything

16    else that I need to do, with regard to it?

17         MR. RICHILANO:  No, Your Honor.

18         THE COURT:  And then, finally, there are objections to

19    certain information that I think are also resolved by the final

20    version of the report.  For example, there's further

21    information regarding -- I will mess this name up...

22    Mr. Ketcheside.

23         MR. RICHILANO:  Yes, sir.

24         THE COURT:  There's further information regarding

25    Mr. Anderson's seizures and his medical history.  There is

1   further information with regard to the sexual matter that we --

2   that Mr. Richilano has referred to here.  There's further

3   information with regard to alcohol being in the genetic makeup,

4   and all of those matters have been noted, either in the final

5   report or amplified by defense counsel in the Motion For

6   Variance and the Motion To Continue.

7          So, I'm aware of these things, but I don't think

8   there's anything more to do by way of resolving an objection.

9   Again?

10          *MR. RICHILANO:*  Not as far as an objection goes,

11   Your Honor.

12          *THE COURT:*  Right.  Okay.  So, where that leaves us,

13   after all of this, is here, I have resolved the objections to

14   the Presentence Report, I have noted which factual matters I do

15   not intend to rely upon, with respect to the other factual

16   matters, I accept those, as set forth in the Presentence

17   Report, as my findings of fact.  I do accept the guideline

18   calculations as set forth in the Presentence Report, and that

19   means that the Total Offense Level is 29, the defendant's

20   Criminal History Category is VI, which results in an

21   imprisonment range of 151 to 188 months, a fine range of 30,000

22   to $250,000, a supervised-release range of one to three years.

23          I will now hear from the parties.  I should note, for

24   the record, that probation, through Mr. Kinsella, essentially,

25   said, *All right, all right, you are right he is career offender*

1    *but I'm not changing my recommendation*; and that's fine.   I

2    don't have any issue with that.

3              Government, I don't know what your position is.

4              *MR. McINTYRE:*  Your Honor, I will be brief, but

5    ultimately, I came to the same conclusion as probation.   I'm

6    going to stick with my original recommendation and my response

7    to the Motion For A Variant Sentence; that would be a sentence

8    of 37 months, consecutive, followed by no supervised release.

9    I think it's -- it's an interesting and somewhat unique

10   situation, with respect to the guidelines.  It's a conviction

11   that everybody knew about.  We knew about the underlying facts

12   of it.  We just didn't know the legal affect, because, you

13   know, I missed something big.

14             *THE COURT:*  It happens.

15             *MR. McINTYRE:*  There is a cascading affect.  I think

16   37 months does satisfy the 3553(a) factors.  Obviously, a lot

17   of mitigation that I didn't consider initially, because I came

18   in kind of after I filed that response.  I think that's

19   relevant to the Court's consideration.  I think the -- these

20   prison assaults are unduly minimized, in some of the

21   defendant's pleadings and, generally, within the system.  I

22   think they are more serious than some of the ways people

23   discuss them, refer to them, but I think 37 months, for the

24   assault and injury in this case is an appropriate sentence.

25             *THE COURT:*  I suppose on some level I am, I don't

1   know, torturing you.  You know, if I give a below-guideline

2   sentence, at least as I understand it, I'm required to state

3   the bases, so that in the event of some appeal, the Circuit can

4   see whether or not the sentence was a reasonable one within the

5   meaning of the law, and so there -- and there is even some

6   language in some of the cases that suggests such things as the

7   greater the departure or variance, the more detailed the

8   explanation must be.

9           I'm more than able do it on my own, but to the extent

10  that you are saying, in essence, disregard that guideline,

11  what's the basis for it?

12          MR. McINTYRE:  This isn't going to be that helpful to

13  the Circuit, Your Honor, but I think, ultimately --

14          THE COURT:  I don't really -- I'm not, really, trying

15  to appease them, so much as understand where you are coming

16  from.

17          MR. McINTYRE:  I understand.  I think, ultimately, the

18  original error was mine, and it feels inappropriate, under

19  these very narrow, specific circumstances for me to make that

20  mistake, go through the pleading and then say, I gotcha 150

21  months.

22          THE COURT:  I give you that it would be a punk move,

23  and I acknowledge the fact that you are not trying to do that,

24  and I don't mean to make light of it.  I mean, look, nobody

25  tries to get these things wrong.  I have, more than once, begun

1    to express a feeling that I wish we would just tear out of the

2    our plea agreements, these calculations, because they are wrong

3    enough that it causes problems, because despite what I say,

4    people look at it, and on some level, believe that something in

5    that area is what's most likely to occur ... I don't deny that,

6    but it is not something that one can hold close to one's chest,

7    and that's where I pushback, in this case and in other cases,

8    where there are miscalculations.

9         *MR. McINTYRE:*  And I think were it not for the error,

10   I don't think I would make this recommendation; I don't think

11   probation would make their recommendation, but that's just not

12   where we are.

13        *THE COURT:*  I don't know what would have happened if

14   everybody started at 151 to 188 and then tried to figure out

15   where to come down.

16        *MR. McINTYRE:*  Irrelevant --

17        *THE COURT:*  Irrelevant to you, but I started at 151 to

18   188, because I saw this issue from the outset.  All right.  Let

19   me be done with you.

20        Mr. Richilano, I will hear from you.  Let me give you

21   some general previews.  Obviously, there's not going to be a

22   fine.  He doesn't have any money; I'm not going to give him a

23   fine; and you do not care; that is not where your concern is in

24   this matter anyway.  At least I don't believe that that's where

25   your concern is.

1            *MR. RICHILANO:*  No, Your Honor.

2            *THE COURT:*  There's no restitution, because none was

3    sought, so that's off the table, as well.  I'm going to agree

4    with the probation department that there's no need for an

5    additional period of supervised release.  He has a period of

6    supervised release already out of the District of Utah.  Any

7    period I gave him, here, by law, would have to run together

8    with it, and it can be managed by the District of Utah, without

9    the necessity for a concurrent term of supervised release;

10   whether that's a variance or not; don't know; don't care;

11   moving on.

12           And so the next question is what am I looking at in

13   terms of what -- what is he looking at in terms of time?

14   There's this career-offender number, it is there.  I'm not

15   going to give him a career-offender sentence, but it is open as

16   to how far down from there I go.

17           There are two competing realities that are before me;

18   one is, that Mr. Anderson engages in assaultive conduct,

19   repeatedly, and has been doing so since he was a small child.

20   And on the other side of the scale, he has, in all likelihood,

21   some physiological impairments that relate to his conduct.

22   Apgar scores don't mean that much to me, but he did have a

23   series of seizures when he was young.  He was on phenobarbital.

24   He started having difficulties from, if I'm remembering the

25   reports right, as early as the third and fourth grade with

1    aggressive conduct; it's continued all through there.  It

2    continued, and I can get into further details, but it continues

3    up through his teenage years.  It continued while he was

4    hospitalized at the Utah State Hospital, and it continued when

5    he got out, and I'm looking at someone who, when you look at

6    the raw facts, five assaults in five years; four of them

7    prosecuted, one of them dealt with, internally, by the BOP.

8         It is just over and over and over again he assaults

9    people, and so I have, in a very real way, some degree of

10   understanding as to where this conduct is coming from, and

11   that's mitigating, but at the same time that it's mitigating,

12   it's also convincing me that not a thing that I do or that

13   anyone else is going to do is going to change him.

14        I mentioned that he has got supervised release and,

15   you know, I don't believe in the *magical powers of the*

16   *judiciary* or probation to have somehow fixed this thing.

17        I note that every single time that he has been on

18   probation for something like that, it's been an abject failure.

19   I note that he considers mental-health treatment unnecessary

20   and a waste of time.  So what am I going to do with this?

21        *MR. RICHILANO:*  Past tense.

22        *THE COURT:*  Past tense.  Albeit, past tense; but those

23   are the competing things that are out there, and neither one of

24   them... you are not trying to minimize either one of them, but

25   they pull in very different directions and they are both

1    equally real.

2              So, with that kind of preview as to where my head is

3    at, please.

4              *MR. RICHILANO:*  That helps, Your Honor.  I appreciate

5    it.  Let me get this out of the way, first.  I would commend

6    Mr. McIntyre for sticking with his original recommendation, as

7    well as with the probation department, and so there are three

8    officers of the Court telling the Court, you know, what ought

9    to be the result; at least in terms of the amount of reduction.

10             *THE COURT:*  Two of them -- two of those positions,

11   guilt-ridden positions.

12             *MR. RICHILANO:*  Mr. Anderson would have -- it would be

13   almost as if he wrote the Court's colloquy, here.  He told me,

14   early on, that he scoffed at the notion of being on paper.  He

15   thought that, *What?  Probation, that's not freedom*.  He says,

16   *Richilano* -- he calls me by my last name; so does everyone over

17   there -- *Richilano, I was such an idiot*.

18             And I will get another thing out of the way, which I

19   hate admitting, but solitary confinement has changed this man.

20   You asked, *How do we fix it*?  He is the only one who can fix

21   it.

22             *THE COURT:*  If he can.

23             *MR. RICHILANO:*  Well, he is now medicated.  We have a

24   courtroom full of supporters.  I want to acknowledge his

25   mother, Monica Garrison, who is here; his father, Don Anderson;

1    who is here; his grandmother, Bet, sorry I don't know your last

2    name; Summer Anderson, his older sister, who, you know, breaks

3    into tears every time I talk to her about her brother, and

4    finally, Jason Ketcheside, who the Court referred to, and he is

5    a lifelong friend, who is ready to give Zach Anderson a job, a

6    car and a career.

7         How he stays out of trouble and away from assaultive

8    behavior is; number one, he stays sober, and people with

9    deficits like he has, and it's not just frontal --

10   prefrontal-cortex influenced impulse control; he has got

11   bipolar; he has got learning disabilities; he has always been

12   behind the eightball; he has always been behind the curve, and

13   those early assaults, when he was a kid, were out of this

14   feeling of helplessness.  The only way he could express

15   himself.  And there's another thing about those assaults, his

16   mother and his sister told me last night that he has this

17   almost medieval sense of justice, where a wrong has to be

18   righted immediately; not thought through; and he will tell you,

19   *I just don't think things through.  I wish I could do that*

20   *better.*

21        You know, the prison assault, there were other ways of

22   dealing with that situation.  Didn't occur to him; boom.  And

23   there's at least one other assault the Court referred to.  He

24   fakes the fall.  The prison assaults, there was another one, he

25   just took the fall.

1      THE COURT:  There's more than -- there's more than

2  two; as I said, there's five.

3      MR. RICHILANO:  There's at least one of them.  But,

4  you know, he has always pled guilty, because *I'm a loser, and*

5  *so I deserve this*; which is kind of the theme behind our Motion

6  To Withdraw The Plea, and I am not rearguing it, I'm just

7  saying, *Give the man a day in court*.  Anyway.

8      He has support.  He has made changes in his life

9  internally.  He has got to get out and do it, and if he doesn't

10  there's Your Honor, there is --

11      THE COURT:  There's not me, if I'm not giving him

12  supervised release; there's some Judge in Utah.

13      MR. RICHILANO:  The Judge in Utah, and there's whoever

14  will preside over the next criminal action, which I'm telling

15  the Court, now or never, there can't be anymore.

16      So, Your Honor, we ask -- and finally, getting back to

17  the facts, Mr. McIntyre mentioned how these sorts of assaults,

18  with physical injury are minimized, and being a prison guard is

19  a tough job, but, you know, in the discovery, Officer Medina,

20  when he was asked by medical, *Do you have any injuries*, he

21  initially said no, and he had to be reminded, *Well, wait a*

22  *minute, you have got that bruise on your nose*.  So minimal,

23  minimal injury.  A two-second event that was motivated by what

24  the Court heard.

25      THE COURT:  You know, it's neither of my two Marshals

1    that are here today, but I annoyed the hell out of one of them

2    in a case some time ago, where there was a headbutt that took

3    place in the holding area.  It was similar in that the

4    individual was a career offender.  It was -- it was different

5    in that the individual had actually two cases, an assault with

6    a shank at an institution, which is what brought him here, and

7    then while he was here, he launched himself at a Marshal and a

8    headbutt, and counsel was saying that it was minimal, and I

9    heard the statement from the Marshal, as well as others, *Don't*

10   *consider launching yourself at somebody's nose to be ...* well,

11   they consider it to have an element of dangerousness,

12   regardless of its outcome, because you are not just trying to

13   slap somebody.  The whole point of it is, you are trying to, at

14   least, break the nose; if not drive the nose bone in, and cause

15   other damage.  I think a bit of that is somewhat, you know,

16   kind of movies, in terms of how frequently it occurs, but it

17   is -- I'm very much aware of the fact that it is, in this case

18   not *major injury, minimal injury, minimal conduct*, so to speak,

19   but it's not inconsequential conduct, and let's not forget that

20   he -- it's the only assaultive approach that he can take.  He

21   is cuffed up coming out of the that cell.

22          Now, I assume, it's been awhile since I have been to

23   that USP, but I'm assuming that he was cuffed up from the rear,

24   hands behind you, because my memory is that that's how they

25   move you --

1          MR. RICHILANO:  Turn around, stick your --

2          THE COURT:  Stick your hands through the slot, cuff

3     them up; whereas, over in the AD/MAX I think it's that and

4     belly-chained, as well.  So, his ability to do much is somewhat

5     inhibited by how he comes out of that room, and even in that

6     condition, he assaults that guard, then tries to head -- kicks

7     another, and tries to headbutt that other guard, as well.

8          So, there's a lot -- there's more going on here than

9     the singular headbutt.  I'm not saying that, you know, he

10    crippled someone, because he didn't; but I'm saying there's

11    more going on here than, you know a bar fight, headbutt.

12    There's just not; it's not that simple.

13         MR. RICHILANO:  It isn't that simple, for the reasons,

14    I have stated earlier, Your Honor.  It was because of the

15    provocation, and it was the only way he could -- he knew there

16    were going to be consequences.  If he did this and he made

17    contact, they were going to beat the heck out of the him, and

18    that's good, that's fine, that's kind of what he bargained for.

19    He didn't bargain for being indicted, but that's beside the

20    point.

21         He really was thinking the only way I can, you know,

22    *un-bitch myself*, is to show that I can, you know, get beat up

23    and, you know, go back to the cell and it's all good.

24         So, Your Honor, um, it's not that simple.  I agree

25    with the Court.

1          We ask, because of the punishment he already received,

2     for a departure to 15 month, concurrent; or if the Court were

3     to be so inclined, and I don't want to pre-judge, but I'm kind

4     of getting the drift, that the Court thinks that additional

5     punishment is necessary to make -- to impose a sentence that

6     does acknowledge some additional amount of punishment for his

7     wrongful act, but not bury the guy.  Let him go on with his

8     life, with the support of his family, and let's see if he can

9     make it, at 29-years old, finally, on his own as a law

10    abiding -- law-abiding citizen.

11         *THE COURT:*  Why don't you stay there.  Mr. Anderson,

12    if you would join Mr. Richilano at the podium.

13         Let me tell you several things.  Okay.  Number one,

14    this is your opportunity to speak to the Court, if you wish to

15    do so.  You are under no obligation to say anything.  If you do

16    choose to speak, you are under no, if you would, requirement to

17    try and be answering all of the things that you may have heard

18    me say or read in the reports or anything else.

19         In other words, if you choose to speak, you are free

20    to speak to what you wish to and to not speak to what you wish

21    to.

22         The next thing I would tell you is this, if you choose

23    to speak, do not spend a second worrying about slips of the

24    tongue.  You may have picked up on it, already; if not, I'm not

25    someone that's terribly concerned about slips of the tongue.

1    If it happens, it happens, and there's not going to be an

2    adverse consequence to you in any way, shape or form.  I'm more

3    interested in the context of what people have to say, not in

4    the presentation.

5            So, with all of that being said, the floor is yours.

6    I will hear anything that you wish to say.

7            THE DEFENDANT:  Um, well, I just want to start off

8    with, I'm terrified.

9            THE COURT:  No, I get it.

10           THE DEFENDANT:  I'm having a real hard time even

11   talking right now.  This whole -- this whole situation, I mean,

12   I wrote some of this down.  I want to tell you my side a little

13   bit; but then I just want to read what I wrote and then kind of

14   talk about some of the things that you said.

15           THE COURT:  Absolutely.

16           THE DEFENDANT:  So, since being in prison, I have had

17   a lot of time to reflect on my life, and I realize the path I

18   have been on is the wrong one, and since this new charge I'm

19   dealing with right now has been one sucker punch after another.

20           I was placed in the single cell, in the SHU, for 17

21   months, being spun about going to another yard or going to the

22   SMUT program or being prosecuted.  Then they served me a memo

23   saying the AUSA declined prosecution.

24           So, now I call my family, to let them know there's

25   light at the end of the tunnel, and then for them to just tell

1    me that the memo was wrong; I'm still being prosecuted, and,

2    too bad.

3            They are not just playing games with me, at this

4    point, they are playing games with my family, and that hurts me

5    more than anything.  Because it's one thing with a horrible

6    decisions I have made in my life, you know, to mess with me;

7    but then, to mess with my family, it... I mean, I know I did

8    that to myself, at the end of the day, but it's just hard to

9    deal with.

10           And the 17 months in the SHU, by myself, made me

11   realize I have wasted my life, and once I finally got charged,

12   I thought okay, this is the worst it can get.  No more sucker

13   punches.  I was told my guidelines were 33 to 41 months, and

14   that the Judge could sentence me outside of those guidelines,

15   but I was under the impression that my guideline would stay the

16   same, no matter what.

17           I never understood that just days before sentencing,

18   my guidelines could go from three years to a career-criminal

19   offender.  If I was aware of this, I would have took it to a

20   jury trial, where I can call in the CO, who this assault

21   allegedly happened, and also, character witnesses of other COs

22   who deal with me a lot, and they can speak on my interactions

23   with the COs, because I really do treat the staff respectfully,

24   and there are multiple CO's who have said they want to come and

25   write I think it was an impact statement, for me, on my behalf,

1    to let them know how I interact with the staff.

2          And just to kind of go back to -- back into what you

3    were saying, how probation never worked out for me, how I have

4    continually had assaultive behavior.  Your Honor, I have lived

5    horribly for a long time.  I have been in the system since I

6    was a kid, and I had never -- going from the juvenile system to

7    the adult system, I felt like when I was in the juvenile system

8    and I missed out on high school, because I was in secure care,

9    I missed out my golden years.  So when I became an adult, I

10   just became... just dumb, out there running around, trying to

11   make up for my high school years, and then I got stuck.  I'm

12   like probation is not really free.  So I never checked in with

13   probation.  I just was out running around, making horrible

14   decisions.

15         But I have gotten to a point now, in my life, that

16   this whole situation has defeated me.  This whole career

17   criminal, this charge, I'm beaten, mentally, emotionally,

18   everything.  It's -- I'm defeated.  I just want to go home.  I

19   want to change my life.  I want to do something different.  I

20   have an opportunity and recipe to do that.  I have got my

21   brother here, who is willing to give me a job.  I have got my

22   family, who is willing to help support me and do whatever I

23   need to do, to do it right; but I'm in fear that, you know,

24   it's too late and I have lost my life; that I'm going to get

25   hit with this career offender and I'm not going to be able to

1   have a career.  I'm not going to be able to get out, have kids,

2   start a family and do these things.

3          I know probation is free.  And the assaultive

4   behavior, it was in prison, and I was trying to survive prison,

5   and I am not sitting here saying, like... I need to hold myself

6   accountable for my actions.  I made -- I made those bad

7   decisions, but I was just trying to maneuver prison, and when

8   this CO called me a bitch, I was -- all morning long -- so how

9   it worked in the SHU, you throw your laundry bags out of your

10  cuff port, and they come pick up the laundry.  I asked him

11  multiple times if he could -- if he would open my cuff port so

12  I could throw my laundry out, and he ignored me; just like

13  Richilano said, I just told him, all right, fuck you, whatever.

14  He comes up to my door and he tells me, fuck you, and I just

15  brushed my hand in his face, I go hop in bed, and he goes,

16  *That's right, get in bed, you fucking bitch*.  Everybody on the

17  tier starts going *oh, ahh*, and I did have a celly.  I'm put in

18  a horrible position now.

19         I did the one thing that I thought that would help me

20  survive prison and get out of here, and it's -- it's done the

21  opposite.  I'm not surviving prison.  I'm now looking at

22  spending pretty much the rest of my life in here, and I have

23  wasted it.

24         I have disappointed my family.  Everyone, my brother,

25  my sister have done something, you know, to make the family

1    proud.  I haven't done anything to make my family proud.  It

2    terrifies me to think that I'm going to be stuck in here.  I'm

3    never going to have an opportunity to do something to make my

4    family proud.

5             Now, my family will sit here and tell me, *We love you,*

6    *we are proud of you*, but the truth of the matter is, what have

7    I ever accomplished?  I have accomplished nothing, and I am

8    just asking you for an opportunity, please, understand that I

9    have learned.  I have grown up.  Like, I have -- this whole

10   situation has literally changed me as a person; 17 months in

11   the SHU, the career criminal, I am a complete different person.

12   I see things from a whole other perspective.

13            You say you don't want to give me supervised release

14   here, but I want supervised release with you too, so I can show

15   you that if I mess up, you can -- you can do with me as you see

16   fit, whatever; hit me with the career criminal; give me as much

17   time as you want, because I know if I get out, I'm done.  I'm

18   so fed up.  I'm tired.  I just -- I just want to get out and be

19   normal.  I just want to work a job.  I want to have a family.

20   I want to be a normal citizen; and I'm not.  I'm done.  I'm

21   done with all of this.  I don't know what else to say.  I had a

22   lot of things in my head.

23            *THE COURT:*  No, look, there's no issue here.

24            *THE DEFENDANT:*  I'm scared, man.

25            *THE COURT:*  There's no issue here.  All right.  In

1    fashioning a sentence here today, I have considered the

2    presentence, I have considered all matters relating to that

3    report that have been filed by the parties; as is apparent from

4    the record, I have considered things independently of the

5    parties' position, probation's position, everybody's position,

6    and I strive to do that in every case.

7            I'm mindful of the fact that I'm required, by law, to

8    impose a sentence which is sufficient, but not greater than

9    necessary, to achieve the purposes of sentencing as described

10   in 18 U.S.C. 3553.  In fashioning that sentence, I have

11   considered, both individually and as a whole, all of the 3553

12   factors which must be discussed and emphasized by counsel here

13   today.

14           So, Mr. Anderson, the simplest thing for me to do is

15   to just give you a number, and, you know, walk off and that's

16   the way it works; but I don't do that.  I want you to

17   understand my thinking, just so that you are aware of it.  I'm

18   not asking for you or government counsel or your lawyer or

19   probation or anyone else to agree or disagree.

20           As I said, there are things that are pulling in

21   different directions here, and I have made reference to the

22   assaultive conduct.  I have showed motive for assaultive

23   conduct.  I mean, as I understand things, it includes, at least

24   this, from the time of third or fourth grade there were things

25   that were called aggressive or getting in fights in school that

1    were causing you to be suspended or sent home.  What those

2    details are, I don't really know, but I do know that at age 16

3    there was some kind of a juvenile proceeding in which a

4    protective order was issued, which indicates that there was

5    some underlying violence.

6          I do know, from reading the report, from the Utah

7    State Hospital, that the aggression has not been confined to

8    outsiders.  I think the language of the report was that you

9    postured against your mother, but never actually did anything,

10   but there was some kind of posturing that was recounted.

11         There was recounted that there were physical

12   confrontations with your biological father, and that there was

13   a confrontation -- a physical confrontation with your

14   stepfather that led to your destroying the room and other

15   portions of the house which led to the police being called,

16   which is how, later in the year of 2009, I believe it is, that

17   you ended up going into the system and being transferred to the

18   Utah State Hospital.

19         What happened at the Utah State Hospital?  While

20   there, you assaulted three people, two of them, mentally

21   challenged, limited individuals.  The Utah State Hospital

22   considered you to be sufficiently aggressive that they

23   discharged you, not because they couldn't help you or that they

24   had helped you, they discharged you, because they considered

25   you a danger to hospital staff and to other individuals who

1    were patients at the hospital, and that's at age 16.

2        When we get to the adult range, what we have is things

3    that are very concerning.  Paragraph 36 of the Presentence

4    Report refers to an assault of -- well, that's the aggravated

5    assault, which is -- I think it is.  Let me -- no.  Paragraph

6    34 is the aggravated assault.

7        Paragraph 36 is there's an assault that is a

8    misdemeanor assault, but what's interesting about it, is it's

9    an assault while you are on probation for assault.

10        If we go back to paragraph 31 in the earlier stages of

11   the time that you were not incarcerated, it was a simple

12   receiving-stolen-goods conviction, but at that time, you had,

13   with you, a stolen handgun, with an obliterated serial number.

14        That was followed at paragraph 35 by a

15   controlled-substance offense, that really was -- it was some

16   minor marijuana thing, and I am not going to exaggerate.  It

17   was de minimis.  But what is it that is there is that they

18   remove a firearm from your person.

19        So, I have somebody who is out of control or unable to

20   control or unwilling to control, that, now twice, I have seen

21   firearms.

22        There's a trespass that occurs in paragraph 38.  Now,

23   that's not... you're outside; that's not something that is

24   charged as an assault, but look at what it is.  If it's not an

25   assault, it's the first cousin to an assault.  There's a woman,

1    you threaten her, you claim that the, quote, *White boys are*

2    *coming to get her*.  You leave her house, come back to her

3    house, punched the backdoor window pane.  Later, come back

4    again, shout about people coming to get her; throw a Vodka

5    bottle through the window pane on the backdoor.

6            It certainly is aggressive conduct and could easily

7    lead to violence, if it were aimed at someone other than this

8    particular woman, who had the sense to call the police as

9    opposed to engage.

10           Paragraph 39, it's simply you are riding around on a

11   bicycle, with a large machete-style knife in your possession,

12   which I wouldn't care about one bit, but for the fact that the

13   Utah State Hospital records referred to -- your mother

14   referring to you as having a fascination with various and

15   sundry knives of all types.

16           As I said, this is the fifth assault conviction within

17   five years.  It's the fourth while you are in custody, and now

18   it's against an official of the institution.

19           I don't know how to call that anything other than a

20   dangerous person.  I don't know how to do that.  It -- it's

21   simply how it appears to be.

22           On top of that, as I said, no probation has worked, no

23   treatment has worked, and everyone here is focused on one piece

24   of the 3553 factors.

25           Now, this is legal talk; it's mumbo-jumbo; I get it,

1    but I'm supposed to look at a lot of things from a lot of

2    different perspectives.  I'm supposed to look at the impact on

3    you, and create an individualized sentence for you, and that's

4    true, but I'm also supposed to look at other things, like,

5    deterring others; meaning, other people who are in an

6    institutions who are thinking of assaulting guards.  I'm

7    supposed to impose a sentence which shows respect for the law.

8    I'm supposed to impose a sentence which treats similarly

9    situated people similarly, and of course, if I were to do that,

10   one might say that the way to treat similarly situated people

11   similarly, is to impose the guidelines.  In fact that's what

12   the government says in case, after case, after case, after

13   case; not in this one, perhaps, but in case, after case, after

14   case.

15            Even if I disregard that and look at my own cases,

16   there's this individual that I have referred to, I'm not trying

17   to keep his identity, Richard Angel Gonzalez, who was a career

18   offender, who was in a headbutt case, very similar.  It was

19   while in custody; it was a marshal opposed to a prison guard,

20   it's different from yours in that there were two separate cases

21   and I gave him a career offender as to the shank and

22   consecutive time as to the headbutt, but with regard to the

23   headbutt, I gave him 77 months.

24            So, you know, as we focus on what we want to focus on,

25   there are things where there are pieces of this which say, I

1    should give you a minimal sentence, but there are also pieces

2    that people don't know about or think about or talk about,

3    which suggests I should do anything but.

4           Now, having said all of that, I also do agree that

5    there are mental-health issues here.  I also do agree that the

6    existence of the career offender numbers should have some

7    deterrent affect on its own.  In other words, you show up

8    again, you get 15 years; it's as simple as that.  And I am not

9    going to say what any Judge would -- including myself, would or

10   would not do, if there were yet another case, because each case

11   has to be looked at depending upon the facts and all of the

12   rest of it.  But I have got a string of assaultive conduct

13   that -- that, you know, is characterized as being, *Well, it's*

14   *just when you are in custody*.  Well, it's when you are in a

15   hospital; it's when you are at home; it's when you are at

16   school; it's when you are on the street; and it's when you are

17   in custody; and it's nonstop.

18          How do I balance all of those things?  As I said, I'm

19   not going to -- I'm not wracked by guilt here, because the

20   minute I picked this up, I knew what it was, and that's why I

21   stopped and said let me give counsel an opportunity.

22          To be honest with you, with this record, would I give

23   you a period within the guideline range as originally set?  I

24   sincerely doubt it, but am I going to give you 12 and a half to

25   15 and a half?  No.  I'm going to give you five, consecutive,

1    and the reason is, it's not a number I pulled out of the air.

2    The aggravated assault, you got an indeterminate zero to five?

3    It didn't do anything.  The felony assault, you got an

4    indeterminate to five.  It didn't do anything.  Now, I'm not

5    unaware of the fact that those sentences were more paper

6    sentences than real sentences; and what I mean by that is,

7    although you got these five-year sentences, what ended up

8    happening is that shortly after they were imposed, you picked

9    up -- you were convicted in the federal case, and looking at

10   the timing of things, it looks as if you were paroled over to

11   the federal case fairly quickly, or somehow it was just all

12   concurrent time and didn't add a significant amount of time to

13   anything.

14         What I'm saying by all of that, just to make it

15   abundantly clear for the record is, the state sentences of zero

16   to five years, the indeterminate, the five-year sentences,

17   ended up being sentenced to prison in August of 2018, and that

18   is both the -- there were a number of them; possession of

19   dangerous weapon ended up with a zero to five; the aggravated

20   assault ended up with a zero to five; the other felony assault,

21   and I need to find it, quickly, ended up with a zero to five,

22   and all of these things are between August and January of 2019.

23         In January of 2019, that's the federal case, and you

24   pretty much came into federal custody, it looks like,

25   relatively quickly, or at the very least I know that the

1    federal case was run together with all of these other cases,

2    and so all of this stuff just got rolled together in a ball

3    that ended up being not much more than the original five-year

4    sentence, because the estimated release date, as I understand

5    it, would have been November of 2023, which is about five years

6    from 2018.

7           So, however it worked out, in terms of it being

8    indeterminate to five; being paroled or otherwise released from

9    state custody to federal custody, all of these five-year

10   sentences didn't have -- they didn't mean anything; or at least

11   they didn't result in any kind of deterrence of conduct.  So,

12   that's where I'm pulling the number from.  If they didn't mean

13   anything concurrently, then we will see if they mean something

14   successively, but I'm not going to give 12 and a half years;

15   I'm not going to give 15 years.

16          My reasons for variance are; number one, I disagree

17   with the Career Offender Guideline, as it's applied in this

18   case; number two, again, without minimizing it, I don't think a

19   headbutt is worth 151 to 188 months; number three, regardless

20   of what anyone might otherwise say, that includes my prior

21   finding that the sawed-off shotgun is a crime of violence, it

22   is a substantially different type of crime of violence than the

23   other; murder, assault, kidnapping, where there is an actual

24   demonstration of violent conduct.  It is more an expectation or

25   presumption or inference of violent conduct that comes because

1   these weapons have been associated since the 1930s with

2   criminality and mob violence and things of that nature.  I

3   think that's enough of a distinction to where I can and should

4   look at it carefully, and I have.  And then on top of that, as

5   I have indicated, I don't minimize and I don't deny and I can't

6   deny and won't try to that this individual does have what

7   appears to be mental-health issues that are serious; that are

8   ongoing; and that may be physiologically based.  Trying to

9   balance all of those things, that's where I come out, that's

10  what I'm going to do, five years; no supervised release to

11  follow; no fine; hundred dollar assessment; no restitution;

12  we're done.

13          MR. McINTYRE:  Nothing additional.

14          MR. RICHILANO:  Your Honor, would the Court authorize

15  the United States Marshal to allow a family visit on the third

16  floor?  There's the mother, the father --

17          THE COURT:  Yeah, I know they're here.  Frankly, I --

18  I don't think they can do that.

19          MR. RICHILANO:  There is a big room.

20          THE COURT:  What I can do, is this, I will ask the

21  Marshals to allow him -- not physical contact -- but to

22  approach and five-minutes to have a couple of words -- five

23  minutes, two minutes, three minutes, couple words before he is

24  taken out of the the courtroom.  Near to the family, but not --

25  not past that back table.

1        In terms of what goes on, in terms of the rooms

2   upstairs, I just don't control that and think that it's

3   violative of every rule they have got, and I don't -- just

4   don't think it will work.  I think this is the best I can do,

5   and I will accommodate some opportunity -- so that they don't

6   whisk him out, they have some opportunity to have some comments

7   with them, and I understand it's not satisfactory, but it never

8   is; beyond that, Mr. Richilano?

9        *MR. RICHILANO:*  Nothing, Your Honor.

10       *THE COURT:*  All right.  I have already found that

11  there's reason to vary from the guidelines.  I have explained

12  my reasoning.

13       Pursuant to the Sentencing Reform Advocate 1984, it is

14  the judgment of the Court that the defendant,

15  Zachary Paul Anderson, is hereby committed to the custody of

16  the Bureau of Prisons to be imprisoned for a term of 60 months,

17  to run consecutive to the sentence imposed by the U.S. District

18  Court for the District of Colorado, in docket number 18-cr-486,

19  which is the sentence he is currently serving.  No supervised

20  release is imposed.  No fine is imposed.  No restitution is

21  imposed.  There's a special assessment of $100, which is due

22  and payable immediately.  The defendant doesn't have the

23  ability to pay a fine, so I waive the imposition of a fine in

24  this case.

25       The defendant is advised of his right to appeal the

1    sentence.  If he desires to appeal, a Notice of Appeal must be

2    filed with the Clerk of the Court within 14 days after entry of

3    judgment or the right to appeal will be lost.  If the defendant

4    is unable to afford an attorney for an appeal, the Court will

5    appoint one to represent him.  If he so requests, the Clerk of

6    the Court must immediately prepare and file a notice of appeal

7    on his behalf.

8         That being said, I remind the parties that there is a

9    Plea Agreement here, which has, obviously, now been accepted by

10   me, and one of the provisions was a waiver of appellate rights.

11   I simply point that out, and advise Mr. Anderson that he should

12   have further discussion with Mr. Richilano as to how the right

13   to appeal that I just legally am -- have advised you of,

14   because I'm legally obligated to do so, is impacted by the

15   waiver that was part of the Plea Agreement in this case.  That

16   is ... it, I believe.

17        The Defendant is in marshal's custody.  He is remanded

18   to marshal's custody for the return to the Bureau of Prisons.

19        Anything further on behalf of the government?

20        *MR. McINTYRE:*  Just a housekeeping matter, will the

21   Court accept an oral motion for the third point for reduction?

22        *THE COURT:*  Well, obviously, yeah.  I will accept the

23   third-point reduction motion.  Ultimately, it didn't really

24   matter.  I will also accept an oral motion to dismiss

25   Count 2 --

1          *MR. McINTYRE:*  Correct, Your Honor.

2          *THE COURT:*  -- of the Indictment, and hereby order

3     that Count 2 of the Indictment be dismissed, pursuant to the

4     Plea Agreement.

5          Anything else, now, Mr. McIntyre?

6          *MR. McINTYRE:*  No, Your Honor.  Thank you.

7          *MR. RICHILANO:*  No, Your Honor.

8          *THE COURT:*  Recess.

9          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

10         (Recess at 11:02 a.m.)

11                      REPORTER'S CERTIFICATE

12

13         I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.

14

15         Dated at Denver, Colorado, this 6th day of November,

16     2022.

17                          s/Tammy Hoffschildt

18                          _____
                            Tammy Hoffschildt, FCRR,RMR,CRR
19

20

21

22

23

24

25